## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **DAVID ISRAEL,** | ) | **Case No. 17-cv-06452** |
| | ) | |
| **Plaintiff,** | ) | **Consolidated with Case No. 17-cv-06643** |
| | ) | |
| **v.** | ) | **Honorable Charles R. Norgle, Sr.** |
| | ) | **Room 2341** |
| **MICHAEL BUCON, JAMES ADAMS,** | ) | |
| **XTREME PROTECTION SERVICES,** | ) | **Magistrate Judge Maria Valdez** |
| **LLC, DIANE ISRAEL and** | ) | **Room 1041** |
| **SHAWN ENGBRECHT,** | ) | |
| | ) | **Jury Demanded** |
| **Defendants.** | ) | |

## FIFTH AMENDED COMPLAINT[1]

NOW COMES Plaintiff, David Israel ("David" or "Plaintiff"), by his attorneys, Ariel Weissberg, Devvrat Sinha, and the law firm of Weissberg and Associates, Ltd., and as David's *Fifth Amended Complaint* against Defendants, Michael Bucon, James Adams, Diane Israel, Shawn Engbrecht and Xtreme Protection Services, LLC, states as follows:

## PARTIES

1.     Plaintiff, David Israel, is a resident of Cook County, Illinois who resides in Chicago, Illinois and maintains an office at 3100 Dundee Road, Northbrook, IL ("David's Office"). David owned: (a) a residence in Highland Park, Illinois ("Highland Park Residence"); and (b) a condominium in the Gold Coast neighborhood of Chicago ("Gold Coast Condominium") during the time of the events described herein.

---

[1] On June 14, 2018, the Court entered an Order directing the plaintiff to file "a more definite statement in the form of an amended compliant" against all named defendants. See DE 287. Prior to this amendment, separate but related complaints were pending in Case No. 17-cv-6452 and Case No. 17-cv-6643.

2.     Defendant Diane Israel ("Diane") is an individual residing in the Village of Glenview in Cook County, Illinois. Diane has resided in Glenview for the last twenty-seven years.

3.     Defendant James Adams ("Adams") is an individual currently residing in Lake County, Illinois. Adams is a licensed Private Security Contractor with the State of Illinois. Adams has resided at three different locations in Lake County and McHenry County over the last four years, and prior to that resided in several locations in Florida and Tennessee.

4.     Defendant, Xtreme Protection Services, LLC ("Xtreme"), is an Illinois Limited Liability Company with its principal office located at 21720 W Long Grove Rd #C #306, Deer Park, IL 60010.

5.     Defendant, Michael Bucon ("Bucon"), is an individual residing in Cook County, Illinois. Bucon was indicted by the State of Illinois in *People of the State of Illinois v. Bucon,* in the Circuit Court of Cook County, Case No. 17 CR 956 ("Bucon Criminal Case") in connection with conduct pleaded herein. On April 21, 2017, Bucon pleaded guilty in the Bucon Criminal Case to criminal trespass, attempt cyber stalking, and attempt cyber stalking. A copy of the transcript from sentencing proceedings in the Bucon Criminal Case is attached hereto as **Exhibit 1**.

6.     Defendant Engbrecht is the President of CASS Global, Inc., a Florida corporation, and a member of Cass-Global, LLC, a Florida limited liability company. Upon information and belief, Engbrecht resides in Florida but may have moved out of the country to South Africa. Engbrecht was present in Chicago at various times from early-2015 through August 2015 and was heavily involved with the allegations contained herein.

## JURISIDICTION AND VENUE

7.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) because Plaintiff alleges violations of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et al* ("Federal Wiretap Act").  This Court has jurisdiction under 28 U.S.C. § 1367 (supplemental jurisdiction) over the remaining allegations.

8.     Plaintiff originally brought the action in the Circuit Court of Cook County and Defendants removed the action to this Court.[2]

9.     Venue is proper because all events giving rise to the causes of action occurred in the Northern District of Illinois.  Venue is also proper because Plaintiff and Defendants Diane, Bucon, Adams and Xtreme all reside in Cook County.

## FACTS COMMON TO ALL COUNTS

### 2014 Eavesdropping

10.     On April 16, 2014, Ronen Moyal ("Moyal") of Gladio Group Security arrived at David's Office and informed him that he had been hired by Diane to conduct surveillance on David.  Moyal informed that David that his cell phone, David's Office, his Highland Park Residence and the Gold Coast Condominium are bugged.

11.     On April 18, 2014, Moyal returned to conduct a search for listening devices in David's Office and found an electronic surveillance device with a 9-volt battery under David's desk.  A picture of the electronic listening device found underneath David's desk is attached hereto as **Exhibit 2**.

---

[2] See Notice of Removal filed by Adams and Xtreme DE 1 (Case No. 17-cv-6452); and Notice of Removal filed by Diane,  DE  1 (Case No. 17-cv-6643)

12.     On April 23, 2014, David's brother Harey Israel ("Harey") contacted Sergeant Strickland of the Northbrook Police Department and at 4:30 PM, the Northbrook Police arrived at David's Office with an evidence technician and took pictures of the electronic listening device. An investigation ensued but no arrests were made.

13.     At that time, a probate case regarding the estate of Aaron Israel ("Aaron") was pending in Cook County, 2014-P-6788, with the estimated value of the estate being north of $50 million ("Estate Case"), with David and Diane being adversaries in the Estate Case.

14.     At that time, David was also a key witness and an extremely involved third party in a case pending in the Circuit Court of Cook County, captioned *Harey Israel v. Diane Israel*, Case No. 2012-L-3464 ("Cook County Case"), which alleged tortious interference against Diane with respect Aaron Israel's estate.

## 2015 Eavesdropping and Stalking

15.     In early-2015, after Aaron's passing, Engbrecht referred Bucon, who had recently graduated as the top graduate from Engbrecht's bodyguard school in Florida, to Adams, who had also attended Engbrecht's school. Adams was the personal bodyguard and head of security for Diane.

16.     In early-2015, Engbrecht flew to Chicago had dinner with Adam and Bucon where he introduced Bucon to Adams and discussed a potential position for Bucon in Diane's security group. Adams stated that he was not looking to add additional people to Diane's security-detail at that time.

17.     Subsequently, around February 2015, Engbrecht called Bucon on his cell phone and informed him that he had work for Bucon, to be done in coordination with Engbrecht.

Engbrecht directed Bucon to "tail" Harey Israel, Plaintiff's brother and Diane's brother, and relay field notes and photographs to Engbrecht on a daily basis. Engbrecht provided Bucon with Harey's home address and Harey's license plate to commence his surveilling work.

18.     Bucon followed Harey on a daily basis from around 6 AM to 9 PM for a period of three months and reported back to Engbrecht his daily field notes and photographs via email. Bucon was also in constant communications with Adams and relayed to him information about Harey's whereabouts and daily activities.

19.     Adams paid Bucon in cash, using old $100 bills.  Adams paid Bucon by meeting him personally at the Chase Bank branch on 2801 Pfingsten Rd, Glenview, IL 60026 (corner of Willow and Pfingsten Roads).

20.     In 2014 and 2015, Adams only worked for Diane and had no other clients.  Diane instructed Adams to arrange for Bucon to tail Harey and to eliminate any paper trail regarding the surveillance by using cash payments.  Diane herself provided Adams with the old $100 bills used to pay Bucon from a box of old money.

21.     Around May 2015, Engbrecht and Adams met with Bucon at a Panera Bread in a north-west suburb and informed Bucon that they had another "assignment" for him.  The assignment was to "tail" David and report back, as before, his field notes and photographs to Engbrecht.

22.     Diane instructed Adams and Engbrecht to determine what David was doing on a daily basis.  Adams informed Bucon that this work was for Diane.

23.     Bucon followed David for a period of one week but was unable to gain access to David's Office, where David spent significant time and where he met with potential business clients and lawyers.

24.     In 2015, David had confidential, strategic and privileged discussions with lawyers regarding the Cook County Case, the Estate Case and other legal and business matters in David's Office.

25.     Bucon reported to Engbrecht and Adams that he was unable to gain access to David's Office.

26.     Adams contacted Bucon and informed him that Diane believes it's imperative to gain access and listen to conversations in David's Office.

27.     Adams told Bucon that Diane "wants to know what's going on inside the office"[3] and that Diane wants a listening device inside David's Office.

28.     Bucon informed Adams and Engbrecht that he would do some research on how to gain access to David's Office.

29.     Subsequently, Adams called Bucon and told him that Diane was "desperate" to know what was happening inside David's Office and instructed Bucon to "get some ears in there."

30.     On or around May 2015, Bucon dressed up as a Fed Ex delivery man and walked inside David's Office and placed a listening device inside the planter in David's Office.  **See Exhibit 1**, p. 10.  This device had remote capability and could turn on and record conversations

---

[3] Quotations from a recorded interview with Bucon conducted on November 21, 2017, by David's counsel.

when activated from a remote location. Bucon also installed geo-tagging, remote controlled devices on David's cars that could transmit their location to a mobile device.

31.     Upon information and belief, another listening device was installed inside David's Office by Bucon, Engbrecht or Adams around the same time as Bucon placed the listening device in the planter.

32.     Bucon's phone records indicate that in April and May of 2014 he was in constant contact with Adams (941-234-xxxx) and Engbrecht (386-589-xxxx) and had multiple phone conversations with them, sometimes several times a day.

33.     The devices were used to record sensitive information and privileged attorney-client conversations regarding the Cook County Case, the Estate Case and regarding David's business dealings.

34.     Adams, Bucon, Engbrecht and Diane intercepted oral communications in David's Office and used the information for their personal gain, including to gain an untoward litigation advantage in the Estate Case and in the Cook County Case.

35.     Diane also intended to use the information gathered by surveillance and eavesdropping to harass, intimidate and blackmail David.

36.     In late-July of 2015, David met with lawyer Michael Ettinger ("Ettinger") at David's Office to discuss filing a claim for Intentional Infliction of Emotional Distress against Diane.

37.     The meeting took place in David's Office with David, Harey and Ettinger present.

38.     On August 5, 2015, Ettinger received text messages from phone number (847) 665-9883 that were similar to the text messages that David was also receiving from unknown numbers at the time.

39.      On August 10, 2015, Ettinger spoke with Officer Meents regarding the text messages received by him and provided him with contact information of his private investigator James Miller who had traced the phone number as being registered to a Deborah Berg of 254 N. Branch, Glenview, IL.

40.     After that meeting, Ettinger went to his office in Palos Heights, Illinois and saw that the ceiling panel above his desk had been moved.  Ettinger confirmed with the landlord and his staff that no one had been at his office to their knowledge.  Ettinger understood the intrusion into his private office as a threat from Diane regarding his consultation with David.

41.     On August 18, 2015, David was served with a summons and complaint alleging Intentional Infliction of Emotional Distress in the case captioned *Israel v. Israel,* Case No. 2015 L 007862 filed in the Circuit Court of Cook County, Illinois.  This was the very cause of action that was discussed by David and Ettinger at the meeting in David's Office.  This case was later voluntarily dismissed by Diane.

42.     Diane, Adams, Bucon and Engbrecht dialed in to remote-controlled eavesdropping devices and each of them intercepted David's private conversations.

43.     Diane has *underlined admitted* to the following facts in this lawsuit by operation of law:

a.   Diane listened to conversation happening in David's Office through the listening devices placed in David's Office.  See Diane Response to David's Request to Admit No. 14; 38. **Exhibit 3.**

b.  Diane instructed Adams to place listening devices in David's Office, David's Highland Park Residence, and David's Gold Coast Condominium. Id., No. 9-11; 35.[4]

c.  Diane listened to privileged attorney client communications at David's Office.  Id., Nos. 39-40.

44. Adams has _admitted_ to the following facts in this lawsuit by operation of law:

a.  Adams listened to a conversation between David and Ettinger wherein David had discussed filing a lawsuit against Diane for intentional infliction of emotional distress.  See Adams Response to David's Request to Admit No. 46; **Exhibit 4**.

b.  Adams listened to conversations inside David's Office from May 2015 to September 2015.  **Exhibit 4**, No. 45.

## Threatening Text Messages and Discovery of Additional Eavesdropping Devices in 2015

45.  On July 14, 2015 at around 9:30 PM David was driving from Waukegan, IL to Chicago, IL when he received a text message from an unknown person using the telephone number (847) 379-1068 stating something to the effect of "Hello, how are you doing?"

46.  David responded to the text message that he did not know who that was, and then over the course of two months he received multiple text messages from (847) 379-1068 (from July 14, 2015 to July 30, 2015) and from (847) 354-4029 (from August 4, 2015 to August 13, 2015) disclosing time-sensitive information that led David to reasonably believe that he was in immediate

---

[4] Diane recently served amended answers to David's Requests to Admit wherein she withdrew her Fifth Amendment privilege and denied that listening devices were placed inside David's Highland Park Residence or Gold Coast Condominium.  She continued to assert the Fifth Amendment with respect to listening devices placed inside David's Office.

physical danger. Screenshots of the images along with the date and time stamp of the text messages are attached hereto as **Group Exhibit 5**.

47. Upon receipt of the second text message stating, "I am your worst nightmare," David was especially concerned about his safety and the safety of his adult children and grandchildren.

48. On July 17, 2015, while David was golfing at the Ravinia Country Club, he got a text message stating, "Don't get too tan. I have a membership here too" from the (847) 379-1068 phone number.

49. Concerned that he was being followed, David contacted Moyal and relayed the content of the text messages to him. Moyal trailed David to determine if he was being followed and after trailing David for an extended period of time, informed David that he was not likely being followed but that his car had a tracking device that was beaming his geographical location to unknown persons.

50. Moyal then searched David's car and found a GPS tracking device attached with a magnet underneath the car's rear fender. A picture of the GPS device affixed to David's car is attached hereto as **Exhibit 6.**

51. When Moyal discovered the GPS device on David's car, David immediately called his brother Alan Israel, who had borrowed David's second car, a Jeep, and was then in Iowa. David informed Alan about a GPS device potentially being attached with a magnet to the back of the car. Alan pulled into a gas station and conducted a search of the Jeep and found that underneath the rear-fender was a GPS, similar to the one Moyal found on David's BMW.

52. David contacted the Northbrook Police Department on July 17, 2015 at around 5:30 PM and reported the threatening text messages and the GPS devices on both of his cars to the dispatcher

53. Officer Johnson of the Northbrook Police Department responded to David's complaint and spoke to him about the text messages and the GPS devices attached to his cars. David informed Officer Johnson about contested matters in probate court regarding his father's estate between him and Diane, and about the police complaint he registered in 2014 regarding the audio bug underneath his desk.

54. Officer Johnson took photographs of the GPS tracking device on the BMW that contained within it an AT&T cellular SIM card bearing the number 89014103277703171616.

55. The GPS tracking device was a product of the Electroflip brand and was capable of using the internal cellular chip to transmit its location via text message to any cellphone.

56. On July 19, 2015 at 4:09 PM, David received another text message from the (847) 379-1068 number stating, "The flower pot next to the door. I would like you to look at it. Admire it for a moment."

57. Upon receipt of this text message, David panicked and conducted a thorough search of his Gold Coast Condominium and found no suspicious items in any flower pots. David sent his brother Harey to conduct a search of all flower pots in David's Office and his Highland Park Residence.

58. David also contacted the Northbrook Police Department and Officer Johnson, Sergeant Peterson and Officer Pozniak responded to David's Office and checked the exterior of the building but did not find any flower pots.

59. The next day, on July 20, 2015, Moyal conducted an internal sweep of David's Office and found another eavesdropping device in a large planter with artificial plants next to the printer directly outside David's inner office. A picture of the eavesdropping device found on the planter in David's Office is attached hereto as **Exhibit 7.**

60. David immediately called the Northbrook Police Department to inform them that he had found the eavesdropping device in David's Office.

61. On July 20, 2015, Detective Meents responded to David's Office and met with David, Harey Israel, Moyal and Rahimzadeh (Moyal's co-worker). David showed Detective Meents the 2 inch by 2 inch listening-device, who took the device into evidence after removing the SIM card from the device. The SIM card was also taken into evidence by the Northbrook Police Department.

62. On July 21, 2015, after the Northbrook Police Department had confiscated the device, David received a text from the (847) 379-1068 number telling him, "Hope you now have an idea what I have against you. I call and we discuss or I escalate this to another level." **See Group Exhibit 3.** David immediately became nervous upon receiving this text message and believed that his contact with the Northbrook Police Department would lead to retaliatory action against him. He believed his life and his safety were in immediate danger.

63. On the same day, David received texts from the (847) 379-1068 number saying, "P.S. All devices have audio recording capability from a remote location."

64. On that same day, David received a text message saying, "A bit hot to be wearing that shirt don't you think David? Let's see where you end up I'm not too far." These texts placed David in immediate apprehension because he believed that someone was in close vicinity to him and was stalking him as he walked in a long-sleeved shirt on a hot day.

65.     On July 23, 2015, David receives at text message from (847) 379-1068 saying, "We are all coming for you David."  David, in attempting to respond to Harey, mistakenly responds here, "Just got this. I'm in a meeting until 3:15 and we'll talk then."  David receives a reply, "That's okay. I'll continue to listen."  David was especially concerned that private business meetings and phone calls in his David's Office and private personal matters in his Gold Coast Condominium and Highland Park Residence were being recorded or bugged.

66.     Because of the discovery of listening devices and the threatening text messages, David altered his lifestyle.  He would communicate his plans for the following day to his brother Harey the night before, including when and where he was traveling to in order for Harey to monitor his location and his safety.

67.     Furthermore, David stopped visiting his children and grand-children as often as used to because he was concerned that an attack on him when they were present would end up hurting his family members.

68.     David applied for a gun-license and a concealed carry permit to defend himself. This concealed carry permit was initially rejected by authorities and David had to appeal the decision that led to the incurrence of legal fees.

69.     On August 11, 2015, David received the following text from (847) 379-1068, stating, "hey David hope your week is going well, wanted to give you a little more information prior to us meeting. By now you have attempted to uncover all the little ears that we have places…..but I'm willing to bet you missed several….there was a teddy bear sent to you awhile back from a cancer center……you might want to open the bear up, a big surprise awaits…..we know everything and have been listening for quite a while…keep that in mind, see you soon"

70. Prior to August 11, 2015, David had received a teddy bear from a cancer center thanking him for his charitable donation. David had placed this teddy bear on a credenza in his office near his desk. On August 3, 2015, David and Harey had superficially searched the pink teddy bear on the credenza but did not feel anything hidden in the stuffing. They became concerned that the teddy bear could have a sophisticated wiretap hidden within it.

71. Later that day, Moyal came to David's office and cut open the teddy bear and inside the teddy bear was a listening device which contained an AT&T cellular SIM card number 89014103278021134450. A copy of the pink teddy bear on the credenza with the listening device inside it is attached hereto as **Exhibit 8.**

72. Around this time, David stopped talking about any legal issues in David's Office or the Highland Park residence and would visit public places to discuss any legal matters.

73. On August 24, 2015, Officer Meents of the Northbrook Police Department received from AT&T information responding to a subpoena he had sent them regarding the (847) 379-1068 number and the SIM cards from the GPS tracking device on David's BMW. The SIM card had from the period of July 6, 2015 to July 17, 2015:

a. 2,033 calls/texts that originated from the GPS tracker and terminated to 312-953-0300

b. 651 calls/texts that originated from the GPS tracker and terminated to 262-422-1380.

c. 98 calls/texts that originated from 312-953-0300 and terminated to the GPS tracker

d. 6 calls/texts that originated from 288-090-0909 and terminated to the GPS tracker

- 14 -

74. Officer Meents then sent subpoenas to AT&T and Verizon Wireless regarding the phone numbers mentioned above. Verizon and AT&T responded to the subpoenas on September 2, 2015 and provided that 312-953-0300 belonged to Michael Bucon with an address of 6719 S. 91st St., Oak Lawn, Illinois. Verizon Wireless subpoena-response shows phone 262-422-1380 belonged to Michael Bucon, with an address of 1600 Michigan Blvd., Racine, Wisconsin.

75. Bucon's phone records reveal that he was in constant communications with Adams and Engbrecht with both phone calls and text messages from April 2015 to September 2015. Bucon and Adams sent more than 200 text messages to each other during this time frame and made numerous phone calls. Bucon and Engbrecht sent around 100 text messages to each other during this time frame and also made numerous phone calls.

76. On April 4, 2016, the Department of Homeland Security contacted Officer Meents and informed him that Bucon was on a flight from Mexico to Chicago-O'Hare International Airport. Officer Delderfield of the O'Hare tactical unit took custody of Bucon and arrested him and transported him to 26th and California.

77. Bucon pleaded guilty in the Bucon Criminal Case to criminal trespass and attempt cyber stalking. See **Exhibit 1**.

## <u>COUNT I: EAVESDROPPING IN VIOLATION OF 720 ILCS 5/14-2</u>

78. Plaintiff hereby incorporates all prior allegations as if fully pleaded herein.

79. 720 ILCS 5/14-6 titled "Civil Remedies to Injured Parties" provides for a private cause of action against all parties who commit an act of eavesdropping as defined in 720 ILCS 5/14-2.

80. Using a recording device in a surreptitious manner for the purpose of overhearing any private conversation without the consent of all parties is a violation of the Illinois Eavesdropping Law, as amended by Public Act 98-1142 in 2014.

81. Bucon, an employee of Xtreme, pleaded guilty to cyber-stalking, stalking and criminal trespass to real property in his criminal case, *People v. Bucon*, Case No. 17 CR 956, and admitted and pleaded guilty to installing listening devices and intercepting private conversations without the consent of all parties.

82. Bucon was acting as Adams and Xtreme's agent and had no independent reason to stalk David and install listening devices in David's premises and the car.

83. Diane directed Adams, Bucon and Engbrecht to stalk David and install listening devices in David's premises to accomplish Diane's goal of getting "ears in David's Office."

84. Engbrecht listened to conversations in David's Office without David's consent.

85. Adams listened to conversations in David's Office without David's consent. See Adams Response to David's Request to Admit No. 17. See Adams Response to David's Request to Admit No. 45-46. **Exhibit 4**.

86. Bucon listened to conversations in David's Office without David's consent.

87. Diane listened to conversations in David's Office without David's consent. See Diane Response to David's Request to Admit No. 14; 38. **Exhibit 3.**

88. Diane used this information to gain an untoward litigation advantage and to threaten and harass David.

89. Pursuant to 720 ILCS 5/14-6, Defendants are liable for all actual damages suffered by David.

90. David's actual damages included the retention of cyber-security experts, private detectives and attorneys and resulted in damages in excess of $200,000.00.

WHEREFORE, Plaintiff, David Israel, prays for the entry of a judgment against all defendants for an amount not less than $200,000.00, punitive damages, and for such other relief as the court deems just and proper.

## COUNT II:   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

91. Plaintiff herein realleges all prior allegations as if fully stated herein.

92. Diane retained Adams, Bucon, Engbrecht, Luke Sloan and others ("Diane's Bodyguards") to stalk, harass and intimidate David.

93. Diane's Bodyguards' actions, including stalking David, eavesdropping on private conversations without consent, and sending threatening text messages to David, comprises extreme and outrageous behavior and goes beyond oppressions and petty trivialities.

94. Diane's Bodyguards' actions resulted in David to be without any expectation of privacy at any point of the day, which continues to this day.

95. Diane directed the actions of Diane's Bodyguards.

96. Diane and Diane's Bodyguards intended and knew that extreme distress will result from their actions but went ahead with their actions in a scheme to intimidate and harass David, on behalf of Diane.

97. A reasonable person should not have to fear that his oral communications are being intercepted by legal adversaries and used against him.

98. The continuous stalking and text messages caused David extreme emotional distress and led him to change his lifestyle in the following ways:

    e.  He applied for a gun permit and a license for a conceal and carry;

     f.    He took tactical self-defense classes with Vanguard Training to ensure his safety if attacked;

     g.    He limited his interactions with his family and friends in order to prevent them from any violence that may ensue because of him;

     h.    He reported all his daily activity and meetings to Harey Israel beforehand so that he could be tracked and monitored for safety.

     i.    He had to retain security experts to find the listening devices and provide protection services to him.

     j.    He had to have all legal matters be discussed outside his office and his residence in order to prevent eavesdroppers from using that information against him.

WHEREFORE, Plaintiff, David Israel, prays for the entry of a judgment against all defendants for actual damages, including pain and suffering, and punitive damages not less than $1 million.

### COUNT III:    RECOVERY OF CIVIL DAMAGES PURSUANT TO 18 U.S.C. § 2520 (FEDERAL WIRETAPPING ACT)

99.     Plaintiff herein realleges all prior allegations as if fully stated herein.

100.     Section 2520(a) of the Federal Wiretapping Act provides that "any person whose wire, oral or electronic communication is intercepted, disclosed or intentionally used in violation on this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate."

101.     Section 2520(c) of the Federal Wiretapping Provides that the damages that may be recovered by a plaintiff brining a civil cause of action in the amount that is the greater of: (i) the sum of actual damages suffered by the plaintiff and any profits made by the violator, or (ii) statutory damages of $100 a day for each day of the violation or $10,000.

102.    Bucon intercepted oral communications in David's Office without David's consent.

103.    Diane intercepted oral communications in David's Office without David's consent. See Diane Response to David's Request to Admit No. 14; 38. **Exhibit 3.**

104.    Adams intercepted oral communications in David's Office without David's consent. See Adams Response to David's Request to Admit No. 45-46. **Exhibit 4**.

105.    Engbrecht intercepted oral communications in David's Office without David's consent.

106.    Defendants used remote-controlled devices, including the listening device placed inside the teddy bear, to listen to privileged attorney client communications regarding the Cook County Case.

107.    Defendants used the information obtained by listening to David's conversations against David, including filing a lawsuit against David based on the very claim discussed by David and Ettinger at David's Office.

108.    Diane disclosed the information obtained by listening in to David's conversations to third parties, including to her attorneys, without disclosing the source of such information.

109.    No person should have to fear that his oral communications are being intercepted by legal adversaries and used against him.

110.    David's actual damages included the retention of cyber-security experts, private detectives and attorneys and resulted in damages in excess of $200,000.00.

WHEREFORE, Plaintiff, David Israel, prays for the entry of a judgment against all defendants for not less than $200,000.00, and for such other relief as the court deems just and proper.

## COUNT IV:   INTRUSION UPON SECLUSION

111.   Plaintiff herein realleges all prior allegations as if fully stated herein.

112.   The Illinois Supreme Court recognizes that one who intentionally intrudes, physically or otherwise, upon the solitude or section of another or his private affairs or concerns, is subject to the liability to the other for invasion of his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offense to a reasonable person."

113.   The placement of recording devices in David's Office was unauthorized, objectively unreasonable, and was necessarily meant to intrude upon private matters.

114.   In fact, Defendants intercepted privileged attorney client communications that David had every expectation were private and confidential.

115.   Diane's Bodyguards and Diane listened in on private matters, including conversations between David and his attorney concerning ongoing and potential litigation, and personal conversations and activities at David's Gold Coast Condominium, David's Office and Highland Park Residence.

116.   Diane directed the actions of Diane's Bodyguards.

WHEREFORE, Plaintiff, David Israel, prays for the entry of a judgment against all defendants in the amount of $200,000, punitive damages in the amount of $1 million, reasonable attorneys' fees; and for such other relief as the court deems just and proper.

## COUNT V:  TRESPASS

117.   Plaintiff herein realleges all prior allegations as if fully stated herein.

118.    From May, 2015, and continuing through August, 2015, Diane's Bodyguards, entered David's Office and installed audio recording devices therein without authorization. Diane's Bodyguards also installed GPS devices, without authorization, in David's vehicles, the BMW and the Jeep, at Diane's direction.

119.    This entry into David's real and personal property was without authorization.

120.    This entry into David's real and personal property was without justification.

WHEREFORE, Plaintiff, David Israel, prays for the entry of a judgment against all defendants in the amount of $200,000 and punitive damages in the amount of $1 million; and for such other relief as the court deems just and proper.

## COUNT VI:    CIVIL CONSPIRACY

121.    Plaintiff herein realleges all prior allegations as if fully stated herein.

122.    Diane, Adams, Bucon, Engbrecht, and Xtreme entered into an agreement to eavesdrop, stalk, harass and illegally collect information about David, and undertook substantial steps in furtherance of their scheme, including following David, and entering into and placing listening devices in David's Office and tracking devices in David's cars.

123.    Defendants were in continuous communications with each other from April 2015 to September 2015, and discussed their eavesdropping, stalking, and harassment of David on a near-daily basis between themselves.

124.    Defendants illegally listened to David's conversation in David's Office and shared such information between themselves.

WHEREFORE, Plaintiff, David Israel, prays for the entry of a judgment, joint and several, against all defendants in the amount compensatory and punitive damages, not less than the amount of $1 million; and for such other relief as the court deems just and proper.

**DAVID ISRAEL**, Plaintiff


By:_____/s/ Ariel Weissberg_____
         One of his attorneys


Ariel Weissberg, Esq. (Attorney No. 03125591)
Devvrat Sinha, Esq. (Attorney No. 06314007)
Weissberg and Associates, Ltd.
401 S. LaSalle St., Suite 403
Chicago, Illinois  60605
T. 312-663-0004
F. 312-663-1514
Email: ariel@weissberglaw.com
Email: dev@weissberglaw.com

## **CERTIFICATE OF SERVICE**

I, Ariel Weissberg, certify that on August 15, 2018, I caused **FIFTH AMENDED COMPLAINT** to be filed. Notice of this filing was sent by the court's CM/ECF electronic transmission to the following parties, and to any other persons-in-interest registered with the Court's electronic transmission system:

> Glenn E. Heilizer, Esq.
> HeilizerLaw
> Five North Wabash Avenue, Suite 1304
> Chicago, Illinois 60602
> Email: glenn@heilizer.com
>
> Daniel Francis Lynch, Esq.
> Amy J. Hansen, Esq.
> Lynch Thompson LLP
> 150 South Wacker Drive, Suite 2600
> Chicago, IL 60606
> Email: dlynch@lynchthompson.com
> Email: ahansen@lynchthompson.com
>
> Stephen Donnelly, Esq.
> Parikh Law Group, LLC
> 150 S. Wacker Drive, Suite 2600
> Chicago, Illinois 60606
> Email: sdonnelly@plgfirm.com
>
> Steven C. Moeller, Esq.
> Carpenter Lipps & Leland LLP
> 180 N. LaSalle St., Suite 2105
> Chicago, Illinois 60601
> Email: moeller@carpenterlipps.com

> _____/s/ Ariel Weissberg_____
> Ariel Weissberg